and Jerry Harris and I see Mr. Nash and Mr. Schmidt and Mr. Whalen. Can you all hear me? Yes, Judge. All right, then let's proceed. Mr. Nash, I think you're going first. Thank you, Judge. I represent David Gibson, who was convicted of a drug offense and sentenced to 210 months consecutive to a sentence of 144 months. He received in Wyoming a few months earlier. When law enforcement began their investigation, Mr. Gibson, they sought they presented an affidavit to a state court judge to track his phone 24-7. In doing so, they cited United States Code Title 18, Sections 3117 and 3124, which the district court found clearly inappropriate. Mr. Nash, before you go any further, can I ask you just a question procedurally? It struck me as at least unusual that this kind of a request would go to a state court judge. Does that regularly happen in northern Indiana? Well, I don't have any experience with northern Indiana. Occasionally, I know U.S. Attorney's Office will adopt or take a case that has been begun by the local authorities. And I presumed that's what happened here. Mr. Whalen may be able to talk about that more, Mr. Schmidt. All right. Thank you. The affidavit then stated, and this is significant, the following, which were the facts constitute the factual basis necessary to support the requested order. What the affidavit did not say was that the affidavit, that this affidavit supports probable cause. In the other affidavits in this case, that is exactly what the affidavits stated. And those were exhibits four, five, six, and seven to the government's response to the motion to suppress at docket number 129. The court order drafted by the officers of the drug unit stated, it appears that the affidavit has been made in good faith in furtherance of a pending criminal investigation. Again, it does not say probable cause to do the 24-7 tracking. Signing those statutes was not casual or a coincidence or without purpose. In another case decided by a district court judge, she stated that this was an effort to circumvent probable cause. In this case, we have Jones decided in 2012 that made tracking a person's cell phone required probable cause. By 2017, when these officers applied for these court orders, there had been numerous district court cases using this hybrid theory that they used here and they were rejected by the vast majority of courts. And that leads us to good faith. It's difficult. Mr. Nash, before we get to good faith, did you challenge this before the district court? Did you argue before the district court that the affidavits lacked probable cause? Yes, very definitely. Mr. Smith's motion stated very clearly on three different occasions which are cited in my brief that it lacked probable cause. The judge ruled that stated on the record that Mr. Smith's motion, which Mr. Gibson joined, had challenged probable cause. Mr. Nash, was there any evidence before the court that your client or the co-defendant, for that matter, personally used these cell phones? I don't know what you mean by used. If talked on them, I don't know that there was. Is there any evidence that your client handled this cell phone? Overwhelming. That was the premise of the government's case. Numerous times the government elicited from witnesses that they received the phone from David Gibson. And even when they didn't? Was there any evidence that Mr. Gibson used this for personal reasons other than drug transactions? I don't believe the record reflects that, but Mr. Smith might know the answer to that a little better. So how can he have standing to challenge this where the evidence before the court was that there were at least a dozen people using the cell phone? That it was being used for commercial purposes, and there's no evidence other than there was an email from a lawyer to the prosecutor that wasn't responded to. But no other evidence that the cell phone was personally used by your client. But it depends on what you used. He had the phone. The government's case was that it was his phone. And if, perchance, your husband took your phone and they tracked it, you would still have a vested interest in the privacy and an expectation of that privacy? Well, there's a spousal issue there. I don't know that that is in Apples. I'm thinking more of the stash house context. And for stash houses, where there's an affidavit to search, which I see is similar to an affidavit to search the phone here. The phone was not tracking your client, per se. It's an affidavit and a search warrant to search the phone. In the stash house context, where there are multiple people using the stash house for commercial purposes, we have said there's no expectation of privacy. How does this phone on the fax before the court differ from that context? Well, if I might step ahead of myself a bit in answering your question. In the district court, the government basically conceded standing. It's perplexing to me that they can raise it now for the first time on appeal. I think they may dispute that they conceded it. Let's assume they didn't and we get to the standing portion of it. How does this differ from, like I said, the stash house context? How is there an expectation of privacy by your client in this phone that's being used by at least a dozen people for commercial purposes? I don't think the fact that other people used his phone diminishes his expectation of privacy in his own phone. Their case was it was his phone. He doled it out. And it's difficult to me how you how we could conclude that these court orders were valid in the light of Jones and all the other cases regarding tracking. This was 2017. These officers, if we take the words of Justice Alito, who stated responsible law enforcement officers take care to learn what is required of them under the Fourth Amendment and will conform their conduct to these rules. This court has stated that the object object will reason belief of officers is demonstrated by them for them to say, oh, we didn't know what these statutes were about. Oh, we didn't know anything. We were ignorant of them and pass it off to their partner. It's incredible. 41 was cited, which is the federal rule of criminal procedure dealing with search warrants. And the court found probable cause. Why is that sufficient? The court finding a probable cause was severely impaired. They cited facts that were not presented to the state court judge on July 17. Numerous facts, which are recounted in my brief, I think on pages 21 to 23, if I'm correct. Wouldn't the controlled buys that were cited in the affidavits have been sufficient to establish probable cause that that phone was being used for drug transactions? Judge, there were two buys, one buy, both buys by a confidential informant. One was 75 days old at the time the government or the locals applied for the court order. But one was very recent. One was two days before. But that would not have been probable cause. I don't think the district court clearly did not think because in order to arrive at the decision that there was probable cause, he used the facts from the hearing on the motion to suppress. And from the second and third affidavits, which were not presented to the state court judge on July 17th. And I think we all agree that after the July 17th affidavit, the horse is out of the barn. They can't use the second and third affidavit and what's learned in the suppression hearing and say that that was in the mind of the state court judge in granting probable cause. And we don't know what the most important fact here is that judge was only ruling that there was a pending criminal investigation. That's all he had to do, according to the request that was made of him in the order that he signed. All right. Thank you very much. Your time has expired. Thank you. I wasn't planning to speak to the suppression issues, but I do want to answer your honors questions. First, Judge Sykes. I was a prosecutor there for 22 years in northern Indiana. I practice a lot in northern Indiana. And even in federal investigations, they routinely go to state court judges to obtain these kinds of authorizations, even though a United States magistrate judge is readily available. I've never quite understood that. Secondly. Thank you. Here, I was the defense lawyer who had the actual conversation with the USA, and he said explicit to me on January 14th that Mr. Harris possessed the phone. And I confirmed that in the January 15th email. There was no reason to respond to that email because they would say knew that I correctly recounted what he had told me in court. Secondly, the government really didn't challenge standing in the district court. And I would argue with Mr. Nash that the government has forfeited that argument on appeal, relying on Stigl versus the United States and other cases. The with respect to the expectation of privacy, the government itself concedes that if the defendants possess that phone at any time, then they have standing. And the government itself conceded that the defendant, particularly Jerry Harris, possess that phone. So I think the standing argument is a clear, clearly forfeited and losing argument for the government. In my remaining time, I'd like to address three other fundamental errors from below. Those having to do with unreliable evidence, unfair surprise, and an unjust sentencing disparity. Your honors, as you know, drug weight has a dramatic effect on guideline calculations. That's certainly very true in this case here. The level went from 14 to 34 because of an unprecedented methodology for calculating relevant drug weight at sentencing. The government relied exclusively on a phone call extrapolation. In a case where there was no phone call ever wiretapped, not a single one, no phone call ever recorded, not even with the 28 control buys. And no witness ever testified that the phones were used exclusively to set up retail heroin sales. So there's two fundamental parts of the unreliability of what the government relied on to get above that 10 kilogram threshold in a case that only involved 14 grams of heroin seized. The first supposition was that every phone call listed on these toll records, 84,000, everyone was exclusively for heroin distribution. That's in the pre-sentence report, paragraph six. But there is no evidentiary basis for this assumption. And no proof from the government that every phone call was for heroin distribution. To the contrary, the more reasonable assumption would be that some portion of these calls were not related to heroin distribution at all. Simply by using the phones in the hands of multiple persons and using them as cell phones during the part of the day, just as I use my work phone for certain personal calls we all do. That's the reasonable assumption. But the government submitted no evidence and has had no evidence that these phone calls were exclusively for distribution. Is it not reasonable and reliable to take into consideration the context here? And this goes to the point that Judge St. Eve raised a moment ago on a different subject, which is that these are stash house phones. There's no evidence that they were being used for illicit purpose. All the evidence points to purely illicit purposes. And that's why that's what provides the reliability background for this estimate. And yeah, it's a gross sort of rough estimate, dividing the total number of calls by an assumption of four calls per transaction and a certain weight per transaction. This is all ballparking. But that's accepted for purposes of drug calculations. Your Honor, I think context does matter. So I would agree with you. But mere guessing, you know, mere ballparking without some real evidentiary basis crosses over into nebulous assumptions and unreliable estimates. And that's what I think we crossed over. In addition to the assumption that every call, 84,000, was related exclusively to retail heroin transactions, not even permitting that some of these could have been about whose shift was whose or, you know, am I going to be resupplied? No, everyone had to be for retail heroin transactions. And the margin is small here. If less than 5% of the calls were different, you get to a different drug weight and a different sentencing guideline classification. Why wouldn't that err? If there is an error in the sentencing drug quantity calculation, why wouldn't that be harmless in light of what the district court said that the court would have imposed the same below guideline sentence regardless of any guideline errors? And this was substantially below the low end of the guidelines. Your Honor, the district court statement that he would vary to the same range based on his consideration of other factors, I read to go to his calculation with respect to the organizer leader, Mr. Harris being only a manager supervisor, not to the drug weight calculation. And I would seriously doubt that Judge DiGiulio— What are you—what do you base this on? Because immediately— I did not read it as specifically directed to any particular guideline calculation. I read it as directed to all of them. I based that on two things, Your Honor. Immediately before his statement, he's talking exclusively about the manager supervisor determination. And the other reason I doubt that statement by the district court judge applies to drug weight is how dramatic it is. Is Judge DiGiulio really saying that he would have sentenced Mr. Harris exactly the same way even though the drug levels would have been 20 levels less? But the drug levels would not have been 20 levels less if this were just based on Williams' testimony, that you didn't object to the calculations based on Williams' testimony that came to over a kilogram of heroin. Your Honor, Mr. Williams' testimony from which they extrapolated based on number of packs, that was never presented at sentencing as a basis for the guideline calculation. That was not. It was presented at trial, mentioned as an alternative methodology to get to the over one kilogram. And at most, it produced two kilograms. So the drug weight difference would have been dramatically different without this phone call extrapolation. The other thing I think we have to remember is the government changed its game. At trial, it had an expert witness that the defense was unfairly surprised by. No pretrial disclosure, no report, nothing. Went from six calls per transaction to then sentencing, went to four calls per transaction simply for no other reason, it appears, than to get over that 10 kilogram threshold. And there was simply no basis. The agent admitted on the stand that this was a guess. It could have been any number. And the government's argument that this was based on trial testimony, reliable trial testimony, is not true. The one agent who testified about numbers of calls didn't say four calls was the correct number. He said as best he could remember, he had no real strong recollection, went to four calls generally, but some were more. And he couldn't remember specifically. That was his actual trial testimony, volume one, page 49. So... But he also said that some were less. So he took the number six as a reasonable number based on the testimony of what was coming in about how many numbers of calls. It was an average, but he didn't take the four. He took the six. I might say, Your Honor, that the control buys in this case were .13% of the alleged transactions. That is not a valid sample size. To get a valid sample size, statistically, you would have had to have had a sample size 20 times bigger, greater than 584 transactions. Here, Agent Scott was talking about 28 control buys and even conceded that some of those control buys, they had to call more than four times. I see my time is up. If Your Honors have any other questions, I'll be glad to try to address them. Thank you. All right. Thank you very much. Mr. Whalen. Please, the Court. Good morning, Your Honors. We've covered a lot of topics. I'm happy to go wherever the Court wants to go. I was probably going to start with the sensing just to build off what was just said. So, Agent or Officer Scott said, and I quote, most often it was between one and four calls. That's where the four number came from. But then Williams, who's dealing drugs regular basis on the weekends, one of the co-conspirators, testifies on page 369, the most number of calls it took to complete a deal was three. And so, you know, I guess to the extent we're complaining that it was four and four was unreliable, the Court easily could have gone with three. But that's kind of the theme of what happened at sentencing, which is the Court gives the benefit of the doubt to these defendants, and it's building in this cushion. And Judge Sykes, you talked about it being a ballpark estimation, and that's what the guidelines in this Court's case law talk about. It talks of Rangel, and I hope I'm pronouncing that case right, says it's a reasonably though imprecise estimates are permissible. And that's what the Court had here. The Court had testimony that when the phone rang, it was customers. And that's page 361 from Williams and page 494 from Loveless Naylor. So those defendants both testified when each of the phone rings, and there's an argument in reply that we only dealt with one phone. I asked the Court to read the transcript on those pages. The question is about both of the phones. These defendants say when the phone rang, it was customers. Judge St. Eve, I mean, I read the sentencing transcript the same way Your Honor does, and I do want to just read that quickly because I think it's important. The Court says on page 33, and I apologize for turning my head. The Court would also note that even if I calculated the guidelines range differently in the first instance, I would vary to the same range based upon my consideration of the 3553A factors. It then says, for instance, and then talks about the organizer leader. And then it says the Court believes that a sentence in this range would adequately address the 3553A factors. So it's not talking exclusively about the organizer leader. It's saying if I erred in the calculations of the guidelines, I would have gone here anyway. And, you know, just one other point of clarification on that, we're not talking about a 20-level swing. The District Court found one kilogram. Even if the defense is right and the Court should have been bound by the District Court's finding of one kilogram, we're talking about a four-level swing. So there's not some mass disparity in the Court's sentencing. And there's not some reason to think that the Court wasn't being truthful when it said it would have imposed the same sentence regardless. Unless the Court has any questions on the sentencing, I'll move back to the Fourth Amendment issue. And Judge Sykes — One more question, Mr. Weyland. I'm sorry, yes. Was the sentence that was imposed here within the guideline range or below the guideline range if it had been four levels lower? It was within the guideline range, I believe, if it had been four levels lower, yes. Judge St. Eve, the evidence isn't in the record, but I assume the Court just will appreciate the background information. I've talked to the prosecutors. This did not become a federal case until the state authorities were well into it. And so they went to the state court judge because that was an entirely state investigation at that point. Do you know, Mr. Gibson says the order doesn't say probable cause in it. Respectfully, the order on the Government Appendix page 1 and 2 says there's probable cause to believe that the user of the cellular phone has engaged in dealing and possession. Next paragraph. There's probable cause to believe the apprehension of the actor involved in the commission of the above-described offense is. I don't think it was challenging that the order didn't say it. The way I understood his argument was the affidavits didn't say it, and there wasn't sufficient evidence to support what the Court signed, saying probable cause. Yeah, I apologize if I misunderstood what he was saying. That probable cause determination is waived. What the defense argued down below is that there was no probable cause tying these particular defendants to the phone. The position was, you know, there's no evidence that we were involved in any of these deals or that – I think the example they gave is, listen, we're not named in the affidavit, so you can't have probable causes to us. They never challenged that the criminality failed to rise to the level of probable cause. Even if they had, though, this Court would give great deference to the issuing magistrate down below. I'm sorry, the state court judge, who's actually not a magistrate. I keep making that mistake. They gave – you would give great deference to the state magistrate, and there were two controlled buys. And I think, you know, to the extent that you're looking for even more evidence tying to the phone, it's not just that there are two controlled buys. The first buy involves three calls to this particular phone, and each has some substance to it. The first buy says – the first call on the first buy is, we want to buy drugs. The next buy is, go to the – I'm sorry. The next call says, go to this location. The third call says, all right, someone's walking up with drugs. And then the next buy, which was the day before the affidavit is prepared, had two calls. The first saying, we want to buy drugs. The second saying, all right, go to this location. So we have five calls. Those calls weren't recorded, were they? Correct. None of the calls were recorded in this case, Your Honor. Your Honor, Judge St. Eve asked about evidence that they personally handled the phone. There is no evidence at this suppression hearing that either of these defendants personally handled the phone. There is evidence that 12 individuals handled the phone. And there's certainly no evidence that these defendants handled the phone during the relevant 90-day period. What about Mr. Schmidt's argument that he spoke with the prosecutor on January 14th, and the prosecutor said that his client had possessed the phone? And that's what the follow-up email was about. Your Honor, I can address that, having discussed with the prosecutor. You know, the problem with Mr. Schmidt's position is there's no evidence in the record supporting a prosecutor's concession. But I do want to address this issue because I do think it's important because our integrity has been called into question a little bit, rightly or wrongly. What the prosecutor said is that we do not dispute that Mr. Harris had the phone. And there's evidence at trial that shows at some point Harris did have the phone. There's evidence at trial that at some point Gibson had the phone. But that doesn't get them standing to challenge the cell site location for these 90 days. Right? What they're seeking to suppress is the information gathered during these 90 days. They say that was illegally obtained. And there's zero evidence anywhere that they had it during these 90 days. We frankly couldn't pinpoint who had the phone in every instance except for the rare instance. Was it that the phone was at either of the locations where they were residing during these 90 days? Because I thought there was some evidence of that. Yeah. Your Honor, I can't say for sure during these 90 days. I will say during the trial. Again, not the suppression hearing. There is evidence that the phones were near their houses. But for Mr. Harris, for example, his live-in girlfriend is Kayla Hampton, who is also one of the co-defendants charged in this case. And so if she has the phone, that still doesn't give him standing, if you will, to suppress this evidence. She would have an argument. Would he have standing if he had the phone but was sharing it with 12 others? Would that matter? You know, I think that's a good question, Your Honor. I do think his expectation of privacy would be severely diminished because of that. I think he probably does not have a reasonable expectation of privacy when they're dealing with 12 to 15 other individuals sharing the phone. But he can't even meet that initial threshold of saying he had it during the 90 days. Yes, Your Honor. Can I jump in here? Sure. Do we know the identity of the state court judge that issued this order, this series of orders? Yeah, Your Honor. And if you'll bear with me for one second, it's not actually – It's not in the order. It's not anywhere in any of these orders who this judge is. Well, it is in the second order, Your Honor. The first order is just a little – the signature is hard to read. I mean, it's just a squiggle. It's not a signature. No. And I was reviewing that yesterday, Your Honor. In the second order – I'm sorry. If you look in the affidavits, so if you look in the second affidavit, which is 129-3, on page – September? Is that the third one? This is the second one, Your Honor. On page 2 of docket entry 129-3, the affiant says that on July 20th, 2017, the Honorable Judge John – and I apologize, I'm going to mess up his name – Martinocha signed a warrant for precision location. And so they – in the affidavits, they say who the issuing judge was. And it's the same judge all the way through? It is. Yes. Order. It's my understanding, and if I remember the suppression testimony, that it was the same judge all the way through for all three orders. And is that standard practice in St. Joseph Superior Court where the warrant applications or orders of this type don't list a branch number or a judge's name? Yeah. I apologize. I don't know the answer to that, Your Honor. This all struck me as kind of silly. And, you know, I get that your office and federal law enforcement gets handoffs from the state investigators on a regular basis, but it just struck me as a little unorthodox. Yeah, Your Honor, I don't know the answer about the practice of that. I'm sorry. I typically deal with the Hammond judges to the extent I'm dealing with any of the judges. I'm happy to ask the question of our prosecutors if you'd like to know. It just – it struck me as unusual. I used to sign warrant applications as a state judge all the time, and I always put my name on there somewhere so, you know, all the I's would be dotted and the T's would be crossed. I'm willing to bet Your Honor's signature was probably slightly more legible too than the state court judge in this case. But I'm not one to cast stones on that given my signature. Okay. So know who the judge is by virtue of the second affidavit is the answer. That's correct. And the third affidavit, I'm happy to look, but I believe the third affidavit then lists the previous two, and it says we went to Judge Marnocha the first time and then the second time. And I think if the court looks, it's the same judge for the third order as well. Thank you. You're welcome. Your Honors, frankly, I'm not sure there's a whole lot left to address from the defendant's opening arguments. What's your response to the defendant's argument on standing that you didn't contest this below? Or you agreed that they had standing? No, Your Honor. As Your Honor predicted, we do dispute that. The first argument after the evidence was presented was our position that they lack standing. And what I believe they're relying on is Judge DiGiulio asked the state prosecutor, isn't it true that you have standing to track your movements after Carpenter? And the prosecutor said, yes, that's true. And that is the law as near as I can tell. If you have the phone and it's your movements being tracked, you have standing to track it. At no point in time did we ever say these defendants had this phone during these 90 days. I think if the court reads the transcript of that, it is clear that we're pressing our standing argument all the way through. The defendants have also identified that in ruling on the motion to suppress, the district court relied on some information that was not in the affidavits and not before the court at the time the affidavits were signed. What impact should that have? And specifically that the particular cell phone was being used by at least a dozen people. If the defendants, and that's why our position is this argument's waived, because it's ambushing Judge DiGiulio and his factual recitation of the facts. If the defendants had made the argument of this first affidavit fails to show probable cause sufficient to meet the Illinois V-Gate standard, I think Judge DiGiulio would have initially said, all right, I'm going to focus exclusively on the first affidavit. And he would have set forth the facts in the first affidavit. That argument wasn't raised. And so his factual recitation is based on the three affidavits together. And the affidavits themselves say that there were 15 individuals that were using the phone. It's admittedly not the first affidavit, but the second and third, that's correct. And so, again, I think if the argument had been made, Judge DiGiulio would have said, yeah, there are these two controlled buys and that's sufficient to support probable cause under Sidwell and the Seventh Circuit precedent. Your Honors, one other thing that I'd just like to quickly address about the disparity of sentence argument, just to clarify the record a little. There's been some argument that we asked for an extremely high sentence, and that shows we didn't believe that these two individuals were comparators or something along those lines. The timing of this is important. So at docket entry 248, the government asked for 480 months for Gibson. The next docket entry, 249, the government asked for 420 months for Harris. And then Gibson gets sentenced, and that's docket entry 257. And Judge DiGiulio gives him an extreme downward departure, which certainly is right, and it goes down to 240 in this case, plus the 144 in the next case. At the sentencing after Gibson is sentenced, the AUSA in charge of the case comes back and says, Judge, we know we asked for 480, or I'm sorry, 420 in our sentencing memorandum. In light of what's gone on, we're asking for 360, and that's at transcript page 10. And that is consistent with our position on the relative culpability of these defendants. Gibson had just gotten 388 months, and then we changed our recommendation based on that to say, no, if you're going to give Gibson 388, Harris should get 360. And the court did recognize its discretion to consider whether any sentencing is unwanted or disparate. It maybe could have agreed with Mr. Harris and said, well, the fact that Gibson continues to deal drugs entitles him to a higher sentence. But it certainly wasn't outside of the bounds of discretion for the court to say, I have to think about this 140-month consecutive sentence, and so I'm going to adjust my sentence in this case with that in mind. And that's what the Supreme Court held in Dean, and that's what the district court did. So Mr. Harris's substantive unreasonable argument just doesn't hold water in light of that. And, Your Honor, we're happy to address any issue about Agent Ficosi's testimony or the defendant's plea to overrule Hunt and Trenter. I'm sorry, Trent and Hunter. If this court has any questions otherwise, we'd rest on our briefs on those issues and ask that this court affirm. All right. Thank you very much. Thank you. Rebuttal, Mr. Nash, I think your time had expired, but you may have a minute if you have some closing thoughts for us. I do, Judge. I don't think that the court can give the state court judge decision to grant the court order any deference. He was presented with a situation which asked him to conclude that there was a good faith ongoing criminal investigation, and therefore, he should issue the order. And that's what he did. I don't think you can give the district court judge's decision any deference either. No matter what Mr. Whalen says, the district court judge made a finding of probable cause using facts that had not been presented to the state court judge in ordering in giving the court order. He relied on other facts. You can't color that any other way. And the record is replete in this case that Mr. Gibson handed out the phone, possessed the phone. And not being able to give either the state court deference in its ruling undercuts the good faith effort and the fact that the government used this debunked, rejected theory in 2017 in the face of numerous district court decisions. The Supreme Court's decision in Jones suggests that no good faith exception can be made. But the most important thing is not giving any deference in this most unusual case. One of the more unusual things is these briefs were all filed before the hearing on the motion to suppress, although the judge's decision came after. But you can't give deference to the district court's finding that there was actually probable cause because in doing so, he relied on facts not presented to the state court judge. Thank you. Right. Thank you very much, Mr. Schmidt. Your time has expired as well. But if you have closing thoughts, you may have an extra minute. Thank you, Your Honor. With respect to standing, Your Honor, I don't think it's fair for the government to argue on appeal that the defendants don't have standing when the government prosecutor conceded below that defendant Harris had possessed the phone. Secondly, with respect to sentencing disparity, even in the first instance, the government itself asked for Mr. Gibson to receive a sentence that was 60 months longer than Mr. Harris. And in the end, the district court gave a sentence that was almost two years longer to Mr. Harris. Despite the fact that Mr. Gibson was the organizer leader, Mr. Harris wasn't. Mr. Gibson's criminal history was much longer. His other sentence was not another case that Judge Padilla had. That was another heroin trafficking case Mr. Gibson had in Wyoming for which he got 144 months. And to use that as the sole basis for this disparity, I think, is unfair. All right. Thank you very much. Our thanks to all counsel. The case is taken under advisement.